WARREN McGRAW & KNOWLES LLC          Attorney for Plaintiff
By: Terence Sean McGraw
Attorney I.D. #46750
920 Lenmar Drive
Blue Bell, PA 19422
610-584-9400

## IN THE UNITED STATES DISTIRCT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Donn L. Polson**<br>23 Parkway Blvd.<br>Mount Holly Springs, PA  17065<br><br>**vs.**<br><br>**Geisinger Health System Welfare Plan**<br>c/o Geisinger System Services Human Resources<br>100 N Academy Ave, Mc 24-52<br>Danville, Pa 17822-9800<br><br>and<br><br>**Geisinger System Services**<br>100 N Academy Ave, MC 49-70<br>Danville, Pa 17822-9800<br><br>and<br><br>**Geisinger System Services Human Resources**<br>100 N Academy Ave, Mc 24-52<br>Danville, Pa 17822-9800 | Civil Action No. |

|  |  |
|---|---|
| and<br><br>**Life Insurance Company of North America**<br>c/o New York Life Group Benefit Solutions<br>PO Box 81085<br>Cleveland, OH 44181 |  |

# COMPLAINT

This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001 et seq. (ERISA) and more particularly § 502(a)(1)(B) of that Act 29 U.S.C.A. § 1132(a)(1)(B). The court has jurisdiction of this matter under 29 U.S.C.A. § 1132(e).

## Parties

1.   Plaintiff, **Donn L. Polson** (Polson or Plaintiff), is an adult individual and resident of the Commonwealth of Pennsylvania, County of Cumberland, at 23 Parkway Blvd., Mount Holly Springs, PA 17065.

2.   Defendant, **Geisinger System Services** (Employer), is upon information and belief a non-profit corporation in the Geisinger Health System that provides staffing, administrative and personnel services to the system's various clinical entities. It is believed and therefore averred that at all times material hereto it regularly conducted business in the Commonwealth of Pennsylvania and had corporate headquarters at 100 N. Academy Ave., MC 49-70, Danville, Pa 17822-9800

3.   Defendant, **Geisinger Health System Welfare Plan** (Plan)**,** is upon information and belief a trust or other duly formed legal entity created and or sponsored by Employer and designed to provide employee welfare benefits to its employees. It is believed and therefore

averred that at all times material hereto, it regularly conducted business in the Commonwealth of Pennsylvania and has 100 N Academy Ave, MC 24-52, Danville, Pa 17822-9800.

4. Defendant, **Geisinger System Services Human Resources,** (Plan Administrator)**,** is upon information and belief a department of Employer rather than a distinct legal entity. It is, however, named in the Plan's IRS 5500 filing as a distinct administrator of the Plan and is, therefore, included herein for the purpose of completeness. It is believed and therefore averred that at all times material hereto, it regularly conducted business in the Commonwealth of Pennsylvania and has 100 N. Academy Ave, MC 24-52, Danville, Pa 17822-9800.

5. Defendant **Life Insurance Company of North America** (LINA), is, upon information and belief, a corporation duly authorized to transact business within Pennsylvania, with headquarters at 1601 Chestnut Street, 2 Liberty Place, Philadelphia, PA 19192-0003. It is further believed and averred that it conducted claims administration services relevant hereto from a business address at New York Life Group Benefit Solutions, PO Box 81085, Cleveland, OH 44181.

## Jurisdiction and Venue

6. Jurisdiction of the Middle District of Pennsylvania is proper pursuant to 29 U.S.C.A. §1001 et. seq., more specifically, 29 U.S.C.A. §1132(e)(1).

7. Venue is proper pursuant to 29 U.S.C.A. §1132(e)(2).

## Facts

8. At all times material hereto, Polson was a nurse employed at the Holy Spirit Hospital (date of hire 11/07/2016) and was a beneficiary/participant of/in the Plan.

9. LINA issued a policy of disability indemnifying Employer and the Plan for its obligations under the long-term disability portion of the plan covering the employees for certain losses due to disability from employment. A true and correct copy of the policy provided by LINA is attached hereto as Exhibit "A."

7. The policy was and is an "employee welfare benefit plan" as defined in 29 U.S.C.A. §1002(1).

8. On or about May 22, 2020, Polson filed a claim for disability benefits with LINA alleging that he had been unable to work due to a disabling medical condition since May 8, 2020. Polson last worked on May 7, 2020. He alleged he was unable to perform his regular occupation because he suffered physical impairments preventing him from working as a result of impairments including but not limited to chronic systolic congestive heart failure (NYHA Class II/I) with cardiomyopathy and a persistently reduced ejection fraction.

9. LINA reviewed his application and commenced disability payments. On November 4, 2020 after exhaustion of the 26-week elimination period, LINA commenced the payment of long-term disability benefits. Benefits were awarded based on a determination that Polson could not perform his own occupation as a registered nurse.

10. On or about February 2, 2023, LINA notified Polson that it was terminating the payment of long-term disability benefits after November 4, 2022, because the definition of disability under the plan changed to require disability from any occupation and alternative gainful occupations had been identified that he could perform.

11. Polson filed a timely appeal. In support of his appeal, Polson submitted additional clinical records of Penn State Health Cardiology and a Cardiac Residual Functional Capacity Questionnaire completed by his treating cardiac physicians.

12. He argued that the restrictions and limitations enumerated by his treating physicians were, in totality, work preclusive. The providers' restrictions evaluated the impact of both psychic stress and physical stress on Mr. Polson's condition. In contrast, LINA's non-examining medical consultant did not consider psychic stress, an obviously important consideration with a cardiovascular patient suffering disease of Mr. Polson's severity. LINA relied solely on an in house medical consultant in reaching the adverse determination although Polson suffered significant disease.

13. LINA had disingenuously disregarded a social security disability determination by mischaracterizing the reasoning of the administrative law judge (ALJ) and his decision. LINA also disregarded the provisions of the Plan by relying on a vocational analysis based upon a superficial analysis of the impact of his physical restrictions to broad categories of work without properly considering the other vocational criteria required by the Plan.

14. In response to Polson's appeal, LINA forwarded new evidence and offered him the opportunity to respond.

15. Polson filed a timely response providing answers to interrogatories completed by Mr. Polson's cardiology team, a vocational report completed by John Dieckman, MS, CRC, CDMS, Mr. Dieckman's curriculum vitae; and, medical journals regarding the impact of psychic stress on the health of cardiac patients.

16.     Polson commented that the reviewing consultants again ignored the role of limiting psychic stress in the management of his condition. Despite specifically raising this issue in his initial appeal, LINA continued to ignore it. LINA did not specifically ask the reviewing doctors to comment on the need to limit psychic stress. Nor did the reviewing doctors comment upon the issue of psychic stress despite being provided with claimant's appeal letter and despite the fact that the functional capacity check list completed by his treating cardiologists indicated he should be limited to "low stress jobs."

17.     Polson noted that LINA again attempted to minimize or distinguish the SSA ALJ decision awarding disability using disingenuous reasoning. LINA posited that SSA employs age-based standards that are different than the standards applied by the plan. Yet, the age-based standards peculiar to SSA were not used by the ALJ as the rationale for decision. Rather, his decision was based on adjudicated restrictions and limitations (that LINA itself used for its initial vocational analysis) combined with the testimony of an impartial vocational expert.

18.     LINA also attempted to disregard the social security disability award because LINA had acquired "newer" medical information. Yet, the reviewing doctors retained by LINA indicated that claimant's medical condition was stable without significant change. Neither LINA nor the reviewing physicians offer any explanation what evidence was, in fact, new or different and how this new "evidence" justified a different outcome.

19.     LINA's vocational analyst indicate in their report that their opinion was limited to physical restrictions and limitations only. The analyst, therefore, failed to consider the <u>unrebutted</u> <u>opinion</u> of the claimant's treating cardiologist that claimant should limit work to low stress jobs and no comment is made whether the suggested occupations would be low stress occupations from a psychic standpoint.

20. LINA's vocational analyst failed to consider the treating cardiologists' unrebutted opinion that claimant must elevate his legs above the level of the heart 50-75% of the work day. The analyst noted only that the positions would allow for "postural changes," a characterization much different and ill-defined in the face such a vocationally significant limitation.

21. LINA's vocational analyst failed to consider the treating cardiologists' unrebutted opinion that claimant would be expected to be absent from work about four days per month. 48 days of absence during a year is generally considered work preclusive. See, e.g., *Dixon v. Massanari*, 270 F.3d 1171 (7th Cir. 2001).

22. On further review of Polson's reply, LINA finally addressed the role of management of psychic stress with it's non-examining consultant and forwarded an addendum report from the cardiologist who stated that, "*a low stress position would be advantageous if available*." LINA, however, did not request its vocational consultant to take that "advantageous" limitation into account in their analysis.

23. The cardiologist conceded that elevating the legs was medically "advisable" but that it was "unrealistic" to expect elevation 50-75% of the work day. His statement that such an expectation was "unrealistic" disregarded Polson's report to his vocational expert that he elevated his legs "most of the day," a report LINA provided the cardiologist. The consultant assiduously evaded the opportunity to define a "realistic" recommendation other than to state that a patient with severe heart disease and an ejection fraction of 35% should elevate their legs so "when they have the ability to do so."

24. LINA also sought response from a non-examining physical medicine and rehabilitation specialist. Despite the fact that the cardiologist concluded that a low stress position

was advantageous, the physical medicine specialist concluded it was not indicated. Although the primarily disabling impairment was cardiac in nature, LINA did not share the report of the cardiology consultant with the physical medicine consultant. The physical medicine specialist did not offer any rationale for a different conclusion outside his specialty.

25. Although the cardiologist advised that leg raising was advisable, the physical medicine consultant again offered a different opinion outside his specialty, stating that leg raising was not indicated at all. The consultant offered little rationale other than lack of documentation of volume overload.

26. Unconsidered was that a lack of documented volume overload was due to Polson's compliance with his doctor's recommendation to keep his legs elevated aggressively. Polson told his vocational expert, Dr. Dieckman, that "[h]e elevate[d] his legs 'most of the day' and frequently [lay] down due to shortness of breath and exhaustion. He report[ed] swelling in his hands, abdomen and lower extremities. He [took] a diuretic, Furosemide, every morning and report[ed] that he must urinate on average every 15 minutes for the first 6 hours a day. By the end of the day, swelling return[ed] and he [was] usually confined to a chair or bed. He [had] difficulty with any bending or stooping, which exacerbate[d] dizziness and chest pain. He report[ed] that his stamina is 'zero' requiring frequent resting and napping." Although LINA shared this important recitation of symptoms Polson suffered in between his doctor visits with the consultant, he merely recited the existence of that report and did not comment on any consideration of them.

27. Based on these additional reports, LINA ultimately affirmed its original decision to deny benefits.

**COUNT I**
**PLAINTIFF V. ALL DEFENDANTS**
**ERISA VIOLATION**

28. Plaintiff incorporates herein the allegations contained in the preceding paragraphs in their entirety. Pursuant to 29 U.S.C.A. §1132(a)(1)(b), Plaintiff is entitled to bring him civil action to recover benefits due to him under the terms of the policy.

29. Plaintiff believes and, therefore, avers that:

   a) the plan fiduciaries may not have expressly delegated discretionary authority to determine eligibility for benefits or to construe the policy's terms, requiring the court to apply a de novo review standard;

   b) the determination involved purely factual determinations requiring the court to exercise de novo review pursuant to *Luby vs. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991);

   c) the administrator, fiduciary, and/or insurer making the determination did so under the influence of a structural conflict of interest, making the application of a de novo or modified standard of review appropriate;

   d) the determination was arbitrary or capricious, unsupported by substantial evidence, or founded on an erroneous interpretation of plan provision or law.

30. The decision to terminate benefits was arbitrary, capricious, and in error because:

   a) LINA relied on opinions provided by financially interested vendors, who were not provided with all relevant clinical data and medical opinions in the possession

of LINA, cherry-picked the records, disregarded the competent medical evidence of record, disregarded Polson's subjective complaints, and disregarded unrebutted opinions concerning vocationally important functional restrictions and limitations for inappropriate or no reason.

      b)    LINA failed to appropriately consider uncontroverted functional and vocational limitations and limited its evaluation to only physical exertional and non-exertional limitations in violation of the terms of the plan. LINA only considered non-exertional limitations and psychic stress when Polson repeatedly asserted LINA was disregarding the issue. LINA continued to disregard the recommendation of Polson's providers that he could perform only low stress work despite the fact that its consultant opined avoidance of stress was advantageous.

      c)    LINA's non-examining reviewing physicians offered opinions that lacked adequate foundation in the medical record, failed to consider all the evidence of record, failed to offer any reasonable explanation as to why evidence supporting disability was ignored or disregarded, and failed to address contrary opinion evidence.

      d)    LINA denied Polson's claim pursuant to rationale that lacked adequate foundation in the medical record, failed to consider all the evidence of record, failed to offer any reasonable explanation as to why evidence supporting disability was ignored or disregarded, and failed to address opinion evidence even after the failure was brought to LINA's attention.

      e)    LINA's vocational consultant(s) performed only perfunctory analysis(es) matching the general exertional category of occupations under the Dictionary of Occupational Titles with the general exertional capacities expressed by the peer

reviewer and failed to conduct or document a particularized assessment considering all of the material duties and requirements of the proposed occupations. LINA's vocational consultant(s) failed to consider all appropriate vocational considerations required by the plan. LINA's vocational consultant failed to consider all relevant limitations established by the evidence.

f) LINA disregarded and ignored the vocational interview, testing, findings and opinions of Dr. Stephen Gumerman without having them adequately reviewed or rebutted and without offering adequate explanation in its decisional rationale.

g) LINA failed to comply with the various requirements of the Department of Labor's Claims Procedure Regulation at 29 C.F.R §2560.503-1.

h) LINA did not secure a medical examination or attempt to resolve obvious inconsistencies in the opinions of its medical consultants.

i) LINA failed to evaluate all the medical evidence, failed to identify and resolve any conflicts in the medical or vocational evidence, and failed provide a rationale for why it rejected certain evidence while accepting other medical evidence.

j) LINA's decision was based on a policy or plan provision that was arbitrary and capricious or otherwise contrary to law.

k) LINA's processing of the claim was arbitrary, capricious and legally deficient.

l) LINA processed the claim in a manner indicating that it was seeking to secure a pre-ordained result.

  m) LINA otherwise acted arbitrarily and capriciously.

  n) LINA's roles as both the ultimate payor of benefits and the entity deciding entitlement to those benefits resulted in a significant structural conflict of interest exacerbated by the financial exposure presented by Polson's claim.

  o) LINA otherwise violated federal law in its administration of the claim.

31. As a direct and proximate result of those actions, Polson has been deprived of benefits to which he is legal entitled.

32. As a direct and proximate result of those actions, plaintiff has been caused to incur attorneys' fees and legal expenses in a total amount not yet known to plaintiffs.

**WHEREFORE**, plaintiff requests judgment against defendant as follows:

 a. Ordering defendant to pay Plaintiff all benefits due under the policy retroactive from the date of termination to the present;

 b. Declaring that all rights and benefits due Plaintiff are vested and non-forfeitable through the issuance of judgment, or, in the alternative, to award Plaintiff a money judgment for all sums due and owing;

 c. Directing that Defendants continue to issue monthly disability benefits to Plaintiff for as long as he continues to satisfy the plan's definition of disability;

 d. Awarding Plaintiff prejudgment interest from Plaintiff's denial of total disability benefits until the date of judgment;

  e. Awarding Plaintiff attorney's fees, court costs and all other reasonable costs incurred, pursuant to 29 U.S.C.A. §1132(g)(1); and,

  f. Granting Plaintiff such other and further relief as the court may deem just and proper.

            Respectfully submitted,
            **Warren & McGraw, LLC**

          By: /s/ Terence Sean McGraw
            Terence Sean McGraw
            Attorney for Plaintiff
            Attorney I.D. #46750
            920 Lenmar Drive
            Blue Bell, PA 19422
            610-584-9400

Date: December 3, 2025